**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

COMMUNICATIONS SUPPLY )
CORPORATION, a subsidiary of WESCO )
DISTRIBUTION, INC., )
)
               Plaintiff, )
)   Civil Action No. 18-1374
        v. )
)
IRON BOW TECHNOLOGIES, LLC, )
)
            Defendant. )

**<u>MEMORANDUM OPINION</u>**

## I.    <u>INTRODUCTION</u>

In this diversity action, Plaintiff Communications Supply Corporation ("CSC") claims that Defendant Iron Bow Technologies, LLC ("Iron Bow") improperly attempted to cancel an order it placed with CSC for customized data communications cabling products and failed to pay for those products in breach of the parties' contract. Although the parties do not dispute that they entered into a contract, they sharply disagree about the operative terms and conditions – particularly concerning cancellation. Presently before the Court are the parties' cross-motions for summary judgment. (Docket Nos. 36, 40). For the reasons that follow, Plaintiff's Motion for Summary Judgment is granted, and Defendant's Motion for Summary Judgment is denied.

## II.    <u>PROCEDURAL HISTORY</u>

As alleged in the Complaint filed on October 12, 2018, Iron Bow contracted with CSC to supply data communications cabling and associated products manufactured by Belden, Inc. (the "Belden Products") in the amount of $1,880,236.03 for Iron Bow's work on a construction project at the Vandenberg Air Force Base in California (the "Project"). (Docket No. 1, ¶¶ 7-9, 12, 16).

CSC alleges that Iron Bow was aware that the Belden Products were "highly customized" and "specifically designed and manufactured for use on the Project," therefore, the order was "non-cancellable" and the Belden Products could not be returned. (*Id.*, ¶¶ 10-11, 13-15, 17). CSC promptly ordered the Belden Products and was ready, willing and able to deliver them but Iron Bow refused to take delivery, refused to pay for the Belden Products, and improperly attempted to cancel the order, all in breach of the parties' contract. (*Id.*, ¶¶ 18-23, 27-33).

On November 9, 2018, Iron Bow moved to dismiss the Complaint for improper venue. (Docket Nos. 8, 9). The Honorable Cathy Bissoon, who was the presiding judge at the time, denied Iron Bow's motion on June 5, 2019. (Docket No. 14).

Following a post-discovery/settlement conference held on March 10, 2020, Judge Bissoon ordered the parties to cross-file motions for summary judgment on the issue of liability only by April 10, 2020. (Docket Nos. 34, 35). Pursuant to Judge Bissoon's order, after resolution of summary judgment, if appropriate, the Court will schedule a status conference to address the adjudication of damages.[1] (Docket No. 35).

Each party filed a timely Motion for Summary Judgment, Brief in Support, Concise Statement of Undisputed Material Facts and an Appendix, as well as their respective responses to same. (Docket Nos. 36-48). The matter is now ripe for disposition.

## III.    RELEVANT FACTS[2]

In May 2015, Iron Bow entered into a subcontract with The Centech Group ("Centech") to perform computer networking and data communications cabling work on the Project. (Docket

---

1    The case was re-assigned to this member of the Court on September 23, 2020.

2    The factual background is derived from the undisputed evidence of record, and the disputed evidence is viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Nos. 38, ¶ 1; 47, ¶ 1).  Iron Bow subsequently requested CSC to provide a quote for the Belden

Products which it intended to use to complete its work on the Project.  (Docket Nos. 38, ¶¶ 2-3;

47, ¶¶ 2-3).

On November 20, 2017, CSC provided Iron Bow the requested quote for the Belden

Products, labeled as Quotation Number "893449 option B" (the "Quote").  (Docket Nos. 38, ¶ 4;

47, ¶ 4).  The Quote listed a description, quantity, unit price and total price for each Belden Product,

as well as a total price of $1,881,095.18 for all the Products.[3]  (Docket No. 39-3 at 2-8).  Under

the description of each Product, it was specified whether it was "Non-Returnable" or "Returnable

– Subject to Belden Restock Fee."  (*See id.*).  The Quote more specifically stated, "[s]ee special

T&C's down below at the bottom," which in turn provided that "ALL NCNR PRODUCT IS

NOTED UNDER EACH ITEM - THESE WILL NOT BE CONSIDERED FOR RETURN.

IRONBOW IS RESPONSIBLE FOR BUYING OFF ON THE BELDEN DESIGN."  (*Id.* at 2, 9).

With regard to terms and conditions, the first page of the Quote specified that "BUYER

AGREES THAT THIS QUOTE AND ANY RESULTING PURCHASE ORDER WILL BE

GOVERNED BY WESCO'S TERMS AND CONDITIONS DATED 011107 AVAILABLE AT

HTTP://WWW.WESCO.COM/TERMS_AND_CONDITIONS_OF_SALE.PDF, . . . WHICH

TERMS ARE INCORPORATED HEREIN BY REFERENCE AND MADE PART HEREOF.

(Docket No. 39-3 at 2).  As relevant to the instant dispute, those terms and conditions contained

the following cancellation provision:

> Buyer may cancel its order for Goods and/or Services, but only if
> WESCO agrees to such cancellation in writing and only after Buyer
> pays reasonable charges for expenses already incurred and
> commitments made to WESCO in connection with the placement of
> such order(s).

---

3    The Quote specified that "[t]he prices stated in this offer shall, unless renewed, automatically expire fifteen days
(15) from the date of this offer."  (Docket No. 39-3 at 9).

(Docket No. 39-4 at 2, ¶ 7).

On December 5, 2017, CSC and Iron Bow began exchanging emails regarding the terms and conditions for the sale of the Belden Products.  (Docket Nos. 38, ¶ 14; 47, ¶ 14).    Initially, CSC proposed utilizing a previously negotiated version of Iron Bow's terms and conditions for its purchase of the Belden Products, but that did not occur.  (Docket Nos. 42, ¶ 7; 45, ¶ 7).  On December 6, 2017, Iron Bow sent CSC its then current standard terms and conditions and stated, "I'll make sure to move it through quickly once your legal team redlines it."  (Docket Nos. 38, ¶ 15; 47, ¶ 15).  On December 11, 2017, CSC sent Iron Bow an email stating "here are the T&C's redlined by our legal department.  Please let me know if these are acceptable for our one time order that is pending." (Docket Nos. 38, ¶ 16; 47, ¶ 16).  In an email on December 14, 2017, Iron Bow attached the redlined terms (the "Negotiated Terms") and stated, "I believe your edits and [sic] fair and reasonable for this one time and for the work being done.  If we can annotate the PO to reference these negotiated terms on today's date that will suffice."   (Docket Nos. 38, ¶ 18; 47, ¶ 18).  Significantly, the Negotiated Terms contained a redline to Section 9.3, which was Iron Bow's standard cancellation provision:

> Iron Bow may cancel, without penalty or cost, the Purchase Order, in whole or in part, to the extent an Iron Bow customer has canceled its corresponding order to Iron Bow, prior to acceptance, and Iron Bow may return for a full refund any Products received by Iron Bow or its Customer in connection with such Purchase Order or portion thereof; <u>provided that Supplier [CSC] will invoice Buyer [Iron Bow] for its costs and expenses previously incurred in fulfilling the order."</u>

(Docket Nos. 38, ¶ 19; 47, ¶ 19).

Later on December 14, 2017, Iron Bow sent an email to CSC, which stated "[p]lease process the attached order."  (Docket Nos. 38, ¶ 20; 47, ¶ 20).  Iron Bow attached to the December 14th email its purchase order for the Belden Products in the amount of $1,880,236.03 (the

"Purchase Order") and the Quote.  (Docket Nos. 38, ¶¶ 21, 22; 47, ¶¶ 21, 22).  The Purchase Order referenced the Quote, stating: "Quote #893449 option B."  (Docket No. 39-7 at 5).  Contrary to Iron Bow's email, however, the Purchase Order was not annotated to reference the Negotiated Terms.  Rather, the Purchase Order stated that "Iron Bow terms and conditions are hereby incorporated by reference and are located at the following link: https://ironbow.com/uploads/files/resources/Purchase_Order_Task_Directive_Terms_and_Conditions_20170505_FINAL_without_signature_block.pdf."  (*Id.*).  As relevant here, Iron Bow's standard cancellation provision provided:

> Iron Bow may cancel, without penalty or cost, the Purchase Order, in whole or in part, to the extent an Iron Bow customer has canceled its corresponding order to Iron Bow, prior to acceptance, and Iron Bow may return for a full refund and without penalty any Products received by Iron Bow or its Customer in connection with such Purchase Order or portion thereof.

(Docket No. 43-8 at 7, ¶ 9.3).

Upon receipt of the Purchase Order, CSC issued a purchase order to Belden for the Products on December 18, 2017.  (Docket Nos. 38, ¶ 24; 47, ¶ 24).  Thereafter, approximately $140,000 of the $1.8 million Purchase Order was delivered and paid for by Iron Bow.  (Docket Nos. 38, ¶ 25; 47, ¶ 25).

In an email on December 22, 2017, Iron Bow directed Belden to "not ship any more items against this PO until further notice."  (Docket Nos. 38, ¶ 27; 47, ¶ 27).  In the same email, Iron Bow requested that Belden "continue to produce the equipment for this order," but Iron Bow "cannot accept it on-site at this time."  (Docket Nos. 38, ¶ 28; 47, ¶ 28).  Belden continued to manufacture the Products and, while ready, they could not be delivered to the Project due to space limitations on site.   (Docket Nos. 38, ¶¶ 29, 30; 47, ¶¶ 29, 30).

In March 2018, Iron Bow asked CSC, "[i]f [Centech] ask[s] to return the returnable items,

what would your restocking fee be?"  (Docket No. 39-28 at 2).  On May 14, 2018, CSC sent an email to Iron Bow stating, "here is a breakdown of what is returnable and what is not.  I attached the quote that was submitted with the original PO.  Anything highlighted in blue is not returnable (as per the notes on the quote as well)."  (Docket Nos. 38, ¶ 34; 47, ¶ 34).  On June 18, 2018, Iron Bow again inquired about what was returnable/non-returnable after Centech inquired concerning same.  (Docket No. 39-31 at 3).  CSC responded that it had sent that information three times and attached the Quote, which "notes what items are non-returnable and what items are returnable." (Docket Nos. 38, ¶ 37; 47, ¶ 37).

Also in March 2018, Iron Bow asked CSC to do a "ship-in-place type deal," in which CSC would bill Iron Bow for the remaining Belden Products but continue to hold them.  (Docket Nos. 38, ¶ 31; 47, ¶ 31).  In May 2018, Iron Bow and CSC again exchanged emails regarding a potential "bill and hold" arrangement.  (Docket No. 39-15).  In an email on June 19, 2018, CSC informed Iron Bow that its parent, WESCO, "made a decision to have the Belden material to be shipped to a Wesco location."  (Docket Nos. 38, ¶ 38; 47, ¶ 38).  CSC also informed Iron Bow that it would hold the material in a WESCO facility but transfer ownership to Iron Bow because it would be customer owned.  (Docket No. 39-16 at 2).  CSC further advised Iron Bow that it would hold the material at no cost until August 1, 2018, after which time a typical storage fee WESCO charges for customer owned inventory in its facilities would apply.  (*Id.*).  A "Customer Material Storage – Reference Sheet" was attached to the email, which listed the storage charge as 5% per month starting on August 1, 2018.  (*Id.* at 4).  The Belden Products ultimately were shipped to a WESCO facility, and CSC paid Belden in full for them.   (Docket Nos. 38, ¶¶ 42, 43; 47, ¶¶ 42, 43).

In the interim (and apparently unknown to CSC), on April 12, 2018, Centech sent Iron Bow a letter stating that "support of Iron Bow [on the Project] is no longer viable."  (Docket No. 39-18

at 2).  According to Centech's letter, "[a]s assessed by the Air Force, continued miscommunication and the apparent lack of adaptability and flexibility with the Modernization design have caused grave concern by the Government, significantly delaying the progress of the Building."  (*Id.*).  As a result, Centech advised that it would "be in search of a new subcontractor."  (*Id.*).  Following this development, on April 18, 2018, Iron Bow invoiced Centech for the Belden Products in the amount of $1,933,533.11.  (Docket Nos. 38, ¶ 46; 47, ¶ 46).

On June 29, 2018, Iron Bow sent an email to CSC attempting to cancel the Purchase Order:

> [I]n accordance with Section 9.3 of Iron Bow's Purchase Order and Task Directive and Conditions which were incorporated into the subject Purchase Order, Iron Bow must exercise its right to cancel Purchase Order Number 3008139, in part, to the extent the items detailed therein have not already been delivered to a final destination.

(Docket Nos. 38, ¶ 47; 47, ¶ 47).  On July 6, 2018, CSC rejected Iron Bow's cancellation, demanded adequate assurance of performance, and notified Iron Bow that it considered the June 29th email to be an anticipatory breach of the Purchase Order.  (Docket Nos. 38, ¶ 48; 47, ¶ 48).  CSC then invoiced Iron Bow for the remainder of the Belden Products in the amount of $1,757,293.12.  (Docket Nos. 38, ¶ 49; 47, ¶ 49).  Iron Bow refused to provide assurance of performance or pay for the remainder of the Belden Products.  (Docket No. 39-2, ¶ 23).

On July 9, 2018, Iron Bow sent Centech a letter stating that "the vast majority of the order placed with [CSC] for the Belden materials is non-returnable and non-cancellable, and the remaining items are subject to restocking fees."  (Docket No. 39-22 at 3).  In another letter to Centech on July 10, 2018, Iron Bow reiterated that the "vast majority" of the Belden Products were "customized for CENTECH's needs . . . and are, therefore, based upon discussions with our suppliers non-cancellable and nonreturnable."  (Docket No. 39-23 at 2).  Iron Bow further demanded that Centech "take and pay for the outstanding products ordered by Iron Bow . . . and

pay any restocking fees imposed for any products that can be returned." (*Id.* at 3). Iron Bow sent another letter to Centech on August 7, 2018, demanding payment in the amount of $1,933,533.11 for the Belden Products. (Docket No. 39-24 at 2). Iron Bow ultimately sued Centech in the Circuit Court of Fairfax County, Virginia for Centech's failure to pay. (Docket No. 39-25). That lawsuit resulted in a consent order of nonsuit without prejudice. (Docket No. 47-2).

## IV.   STANDARD OF REVIEW

Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To withstand summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson*, 477 U.S. at 248. When considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations, but rather is limited to deciding whether there are any disputed issues that are both genuine and material. *Id.* at 249.

If the moving party carries its burden under Rule 56, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations or mere suspicions in attempting to survive summary judgment. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325). The non-movant must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994) (citation omitted).

These standards remain the same when parties file cross-motions for summary judgment. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (internal quotation marks and citation omitted).

## V.   ANALYSIS

A breach of contract claim is established by the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages. *Kelly v. Peerstar LLC*, Case No. 3:18-cv-126, 2020 WL 5077940, at *15 (W.D. Pa. Aug. 26, 2020) (citing *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).[4] As noted at the outset, the parties do not dispute that they entered into a contract. (*See* Docket Nos. 37 at 7; 46 at 7). They disagree, however, on the contract's controlling terms, particularly the cancellation provision, and whether Iron Bow breached the contract by cancelling the Purchase Order and failing to pay for the Belden Products.

CSC argues that Iron Bow breached the contract because there is no evidence that the Purchase Order was cancellable under any set of circumstances. (Docket No. 37 at 9-15). Additionally, even if the Purchase Order could have been cancelled, CSC contends that Iron Bow breached the contract because it was required to pay for CSC's costs incurred in procuring the Belden Products on Iron Bow's behalf. (*Id.* at 16). CSC further asserts that Iron Bow anticipatorily

---

4    Each party has argued that its own standard terms and conditions apply. CSC's terms and conditions contain a Pennsylvania choice of law provision, whereas Iron Bow's terms and conditions contain a Virginia choice of law provision. (Docket Nos. 39-4 at 2; 43-8 at 10). Nonetheless, the Court finds it unnecessary to undertake a choice of law analysis because neither party contends that the result would change the outcome here. (*See* Docket Nos. 37 at 7, n.1; 41 at 11, n.2). Relative to choice of law, the Court further notes that, although the parties cite some Virginia authority in their briefing, they both primarily rely upon Pennsylvania law and Third Circuit authority in advancing their respective arguments for summary judgment.

breached the contract by failing to provide adequate assurances of payment when requested by CSC. (*Id.* at 17). Finally, CSC maintains that it suffered damages because it paid Belden for the Products that Iron Bow has improperly refused to take and pay for, and CSC also has stored the Products in its facility without any payment from Iron Bow for $1,757,293.12 of outstanding invoices. (*Id.* at 18). For these reasons, CSC submits that there is no genuine issue of material fact concerning Iron Bow's liability for breach of contract to CSC. (*Id.*).

Conversely, Iron Bow insists that its standard terms and conditions control and permit it to cancel or return the Belden Products. (Docket No. 41 at 9-15). However, even if the Negotiated Terms apply and the Purchase Order could not be cancelled, Iron Bow asserts that CSC's claim still fails because Iron Bow had the right to return the Belden Products for a full refund.[5] (*Id.* at 15-18). Finally, even in a "battle of the forms" knockout analysis, the applicable gap-filling provision still would not obligate Iron Bow to pay because CSC has never delivered the Belden Products.[6] (*Id.* at 19-25). Accordingly, Iron Bow contends that CSC's breach of contract claim fails as a matter of law and summary judgment should be granted in favor of Iron Bow. (*Id.* at 6).

---

5    The Court finds Iron Bow's return argument irrelevant to the analysis herein, given that there is no evidence to indicate that Iron Bow attempted to return any of the Belden Products. In June 2018, Iron Bow sent an email to CSC stating it "must exercise its right to cancel" the Purchase Order, relying on Section 9.3 of its standard terms and conditions. (Docket Nos. 38, ¶ 47; 47, ¶ 47). Accordingly, the issue here is whether Iron Bow breached the parties' contract by cancelling the Purchase Order, not whether Iron Bow could have returned the Belden Products.

6    Iron Bow's argument that it was not obligated to pay because CSC has never delivered the Belden Products is unsupported by the record. In an email on December 22, 2017, Iron Bow directed Belden to "not ship any more items against this PO until further notice," but to "continue to produce the equipment for this order." (Docket Nos. 38, ¶¶ 27, 28; 47, ¶¶ 27, 28). Iron Bow subsequently inquired about a "ship-in-place type deal," in which CSC would bill Iron Bow for the remaining Belden Products but continue to hold them. (Docket Nos. 38, ¶ 31; 47, ¶ 31). After the parties exchanged emails about a "bill and hold" arrangement, the Belden Products ultimately were shipped to a WESCO facility, and CSC paid Belden in full for them. (Docket Nos. 38, ¶¶ 42, 43; 39-15; 47, ¶¶ 42, 43). This evidence shows that CSC procured the Belden Products for Iron Bow and could have delivered them but for Iron Bow's refusal to accept them.

A.  **CSC's Quote Constituted an Offer, Which Iron Bow Accepted By Issuing the Purchase Order, Thereby Forming a Contract Between the Parties Pursuant to Section 2-207 of the Uniform Commercial Code.**

The parties' disagreement concerning the operative contract terms primarily stems from their disagreement as to which document constitutes an "offer" in this case.  According to Iron Bow, "CSC's Quote constituted an offer, to which Iron Bow's Purchase Order was a ***counter***offer, which was subsequently accepted by CSC thereby forming the parties' contract."  (Docket No. 41 at 9) (emphasis in original).  Building on that argument – and  notwithstanding that the parties agreed to the Negotiated Terms after CSC's Quote and before Iron Bow issued the Purchase Order - Iron Bow insists that its own standard terms apply to the parties' agreement because those were incorporated by reference in the Purchase Order, not the Negotiated Terms.  (*Id.* at 7; Docket No. 46 at 8).  CSC disagrees that Iron Bow's Purchase Order was a counteroffer, as opposed to acceptance of the offer as contained in the Quote, because such argument is "directly contrary to current UCC law."  (Docket No. 44 at 6).  CSC is correct.

"The Uniform Commercial Code is a uniform act governing the sale of goods, which has been adopted in Pennsylvania and several other jurisdictions."  *Tyco Elecs. Corp. v. Milwaukee Elec. Tool. Corp.*, No. 1:10-cv-01807, 2012 WL 4793745, at *2 (M.D. Pa. Oct. 9, 2012); *see* 13 PA. CONS. STAT. § 2101, *et seq.*  Although the UCC does not define "offer," *see Pollack Research & Design, Inc. v. David Round Co., Inc.*, Civ. No. 15-3693, 2017 WL 770948, at *7 (E.D. Pa. Feb. 27, 2017); *Beaver Valley Alloy Foundry, Co. v. Therma-Fab, Inc.*, 814 A.2d 217, 222 (Pa. Super. Ct. 2002), the case law provides guidance on this point.

"Generally, price quotes are not considered an offer, but rather 'mere invitations to enter into negotiations or to submit offers.'"  *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 650 (E.D. Pa. 2002)  (quoting *Bergquist Co. v. Sunroc Corp.*, 777 F. Supp. 1236, 1248 (E.D.

Pa. 1991)).  However, "some price quotes are sufficiently detailed to be deemed offers, which turns a subsequent document from a buyer containing a positive response into an acceptance."  *Id.* (citing *Bergquist*, 777 F. Supp. at 1248).  For a quote to constitute an offer, "it must reasonably appear from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract."  *Id.* at 651 (quoting *Bergquist*, 777 F. Supp. at 1249).  Courts have considered the following factors in analyzing whether a price quote is an offer: the seller's quotation is sent in response to a prospective buyer's request for same; the inclusion of specific terms such as the identification/description of products, their quantities, delivery terms and applicable sales terms and conditions; and whether the quotation is unequivocal and not conditioned upon further approval by the seller or a third party.  *See Reilly*, 206 F. Supp. 2d at 651 (written correspondence contained sufficient detail to constitute an offer, and not merely a price quote, where it included specific terms including product identification, quantity and details for special manufacture of product); *Beaver Valley*, 814 A.2d at 222-23 (written quotation included sufficient terms to constitute offer where seller sent quotation in response to buyer's request for same, the quotation contained contract terms including item description, quantity, delivery terms and listed seller's terms of manufacture and sale, and the quotation was unequivocal and not conditioned upon seller's or third party's further approval).

Applying these factors here, first, Iron Bow requested CSC to provide a quote for the Belden Products in connection with its work on the Project.  (Docket Nos. 38, ¶¶ 2-3; 47, ¶¶ 2-3). The Quote listed a description, quantity, unit price and total price for each Belden Product, as well as a total price of $1,881,095.18 for all the Products.  (Docket No. 39-3 at 2-8).  It was denoted under the description of each Product whether it was "Non-Returnable" or "Returnable – Subject to Belden Restock Fee."  (*See id.*).  The Quote also referenced "special T&C's down below at the

bottom," which specified that "ALL NCNR PRODUCT IS NOTED UNDER EACH ITEM - THESE WILL NOT BE CONSIDERED FOR RETURN.  IRONBOW IS RESPONSIBLE FOR BUYING OFF ON THE BELDEN DESIGN." (*Id.* at 2, 9).  The Quote further stated that "BUYER AGREES THAT THIS QUOTE AND ANY RESULTING PURCHASE ORDER WILL BE GOVERNED BY WESCO'S TERMS AND CONDITIONS DATED 011107 . . . WHICH TERMS ARE INCORPORATED HEREIN BY REFERENCE AND MADE PART HEREOF." (*Id.* at 2). Finally, the Quote was unequivocal and not conditioned upon further approval by CSC or a third party.  Under these circumstances, the Court finds that CSC's Quote was sufficiently detailed to constitute an offer.  Accordingly, Iron Bow's Purchase Order was an acceptance of that offer,[7] not a counteroffer as it now claims.  *See Reilly*, 206 F. Supp. 2d at 650 ("[S]ome price quotes are sufficiently detailed to be deemed offers, which turns a subsequent document from a buyer containing a positive response into an acceptance.") (citing *Bergquist*, 777 F. Supp. at 1248).

In so ruling, the Court rejects Iron Bow's "counteroffer" argument premised on the common law principle that "the acceptance of the offer must be absolute ***and identical*** with the

---

[7]    The Court rejects Iron Bow's argument that the "Quote could not be accepted because CSC's offer embodied in that Quote had expired." (Docket No. 46 at 8). According to Iron Bow, CSC's offer expired weeks before Iron Bow's Purchase Order was issued because the Quote provided that "[t]he prices stated in this offer shall, unless renewed, automatically expire fifteen days (15) from the date of this offer." (*Id.*; Docket Nos. 39-3 at 9; 41 at 12).  Iron Bow's argument lacks merit for two reasons.  First, "where the continued dealings of parties shows that an offer extends beyond a stated deadline, the offer does not expire by its own terms." *Loranger Plastics Corp. v. Incoe Corp.*, 670 F. Supp. 145, 147 (W.D. Pa. 1987) (citing *Continental-Wirt Elec. Corp. v. Sprague Elec. Co.*, 329 F. Supp. 959, 964 (E.D. Pa. 1971)).  In this case, the parties' conduct after CSC supplied the Quote on November 20, 2017 until Iron Bow issued the Purchase Order on December 14, 2017 makes clear that the offer extended beyond 15 days, as shown by their exchange of emails concerning the Negotiated Terms during that period of time.  Additionally, Iron Bow's own Purchase Order belies its assertion that "CSC's offer embodied in [the] Quote had expired."  The Purchase Order clearly references "Quote #893449 option B," (Docket No. 39-7 at 5), which signifies Iron Bow's understanding that CSC's offer contained in the Quote did not expire, contrary to its current contention.  *See Loranger*, 670 F. Supp. at 147 (finding that offer had not expired where purchase order stated that it was "per . . . quotation # 7327 update, dated June 16, 1983").  Surely if Iron Bow believed that the Quote had expired, Iron Bow would not have referenced the Quote in the Purchase Order, for it would have served no purpose.

terms of the offer,"[8] (Docket No. 41 at 11) (emphasis in original), given that the UCC applies to the sales transaction at issue. *See Reilly*, 206 F. Supp. 2d at 651 (citing 13 PA. CONS. STAT. § 2207(a) (expression of acceptance operates to form contract even if it states additional or different terms)). Section 2-207 of the UCC allows parties to commercial transactions to enforce their agreements despite the existence of additional or different terms:

> (a) General rule.--A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (b) Effect on contract.--The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>> (1) the offer expressly limits acceptance to the terms of the offer;
>>
>> (2) they materially alter it; or
>>
>> (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (c) Conduct establishing contract.--Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

13 PA. CONS. STAT. § 2207.

Section 2207 applies where, as here, the parties "conduct establishes a contract, but the parties have failed to adopt expressly a particular writing as the terms of their agreement, and the

---

8   Under common law contract theory, parties entering into a contract were required to reach agreement on all material terms. *Flender Corp. v. Tippins Int'l, Inc.*, 830 A.2d 1279, 1284 (Pa. Super. Ct. 2003). Absent such "'mirror image' correspondence between the terms, the offeree's 'acceptance' would be deemed a mere counter-offer subject to acceptance by the original offerer." (*Id.*). Section 2-207 of the UCC was promulgated to remedy the fact that the "mirror image" rule did not comport with the typical course of dealing in business transactions. (*Id.*).

writings exchanged by the parties do not agree." *Tyco*, 2012 WL 4793745, at *3 (quoting *Step–Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 98 (3d Cir. 1991)). Pursuant to § 2207(a), an expression of acceptance (Iron Bow's Purchase Order) operates to accept an offer (CSC's Quote) even if it contains terms additional to or different from those stated in the offer, which is the case with the parties' competing standard terms and conditions referenced in the Quote and the Purchase Order. As stated, neither party disputes that their exchange of the Quote and Purchase Order, which agreed on the essential terms, was sufficient to form a contract for the sale of the Belden Products under Section 2207. The fact that both CSC and Iron Bow included boilerplate language in the Quote and the Purchase Order limiting acceptance to their standard terms and conditions is not sufficient to preclude formation of a contract. *See Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1576 (10th Cir. 1984) (applying Pennsylvania law). The formation of a contract only would have been defeated if Iron Bow had responded with different or additional terms and "explicitly communicate[d] [its] unwillingness to proceed with the transaction" unless CSC accepted those terms, which did not occur here. *Flender*, 830 A.2d at 1284 (quoting *Daitom*, 741 F.2d at 1577); *see also Reilly*, 206 F. Supp. 2d at 651, n.3 (observing that offeree "must do more than allude to preferred terms" and rather "must demonstrate an unwillingness to proceed with the transaction unless its conditions are met").

### B. The Parties' Conflicting Cancellation Provisions Are Knocked Out of the Contract and Replaced by a UCC Gap Filler.

The Court next considers the operative contract term on cancellation which is at issue here. The Quote specified under the description of each Belden Product whether it was "Non-Returnable" or "Returnable – Subject to Belden Restock Fee." (Docket No. 39-3 at 2-8). It also set forth "special T&C's" which provided that "ALL NCNR PRODUCT IS NOTED UNDER EACH ITEM - THESE WILL NOT BE CONSIDERED FOR RETURN." (*Id.* at 2, 9). Further,

the Quote also stated that it and any resulting purchase order would be governed by Wesco's standard terms and conditions, which were incorporated by reference.   (Docket Nos. 39-3 at 2; 39-4 at 2).  The standard cancellation provision only permitted Iron Bow to cancel its order if CSC agreed in writing and only after Iron Bow paid reasonable charges for expenses incurred by CSC in connection with the order.  (Docket No. 39-4 at 2, ¶ 7).

The parties then engaged in negotiations about the terms and conditions which would apply to the sale of the Belden Products, ultimately agreeing to the Negotiated Terms which were a redlined version of Iron Bow's standard terms and conditions.  According to the Negotiated Term on cancellation, Iron Bow could cancel the Purchase Order if its customer cancelled its order to Iron Bow "provided that Supplier [CSC] will invoice Buyer [Iron Bow] for its costs and expenses previously incurred in fulfilling the order."  (Docket Nos. 38, ¶ 19; 47, ¶ 19).  Iron Bow's representative stated in an email on December 14, 2017 that CSC's "edits and [sic] fair and reasonable for this one time and for the work being done.  If we can annotate the PO to reference these negotiated terms on today's date that will suffice."  (Docket Nos. 38, ¶ 18; 47, ¶ 18).

Despite this representation, Iron Bow's Purchase Order dated December 14, 2017 was not annotated to reference the Negotiated Terms.  Rather, the Purchase Order stated that Iron Bow's standard terms and conditions were incorporated by reference, including a cancellation provision which permitted Iron Bow to cancel the Purchase Order without penalty or cost if its customer cancelled its order to Iron Bow.  (Docket Nos. 39-7 at 5; 43-8 at 7, ¶ 9.3).  There is no explanation in the record why Iron Bow did not annotate the Purchase Order to include the Negotiated Terms as it represented would be done.

Notwithstanding evidence of the Negotiated Terms, the Court is bound to examine the writings exchanged by the parties.  On one hand, CSC's Quote contained special terms identifying

16

certain Belden Products as non-cancellable and non-returnable, along with its standard term prohibiting cancellation unless CSC agreed and Iron Bow paid for expenses incurred by CSC.  On the other hand, Iron Bow's Purchase Order referenced its standard terms which permitted it to cancel the Purchase Order without penalty or cost to the extent its customer canceled its corresponding order to Iron Bow.  Under Section 2207, the parties' terms on cancellation are different, rather than additional.  *See Tyco*, 2012 WL 4793745, at *3 (finding parties' cancellation provisions different under Section 2207 where defendant's purchase order reserved right to cancel order if delivery was not made as specified, whereas plaintiff's acknowledgment provided that cancellation of items would be a breach of contract).

Section 2207(b) sets forth the standard for determining whether additional terms should be included in a contract, but it "is silent on the treatment of terms stated in the acceptance that are *different*, rather than merely additional, from those stated in the offer."  *Tyco*, 2012 WL 4793745, at *4 (quoting *Daitom*, 741 F.2d at 1578) (emphasis in original).  Where the parties' forms include different terms, courts apply the "knockout rule" in order to determine the terms of the contract.  *Id.* (citing *Flender*, 830 A.2d at 1285-87; *Reilly*, 206 F. Supp. 2d at 655; *Daitom*, 741 F.2d at 1578-79).  The knockout rule has been explained as follows:

> the offeree's form is treated only as an acceptance of the terms in the offeror's form which did not conflict.  The ultimate contract, then, includes those non-conflicting terms and any other terms supplied by the U.C.C., including terms incorporated by course of performance (§ 2–208), course of dealing (§ 1–205), usage of trade (§ 1–205),[9] and other "gap fillers" or "off-the-rack" terms (e.g., implied warranty of fitness for particular purpose, § 2–315).

*Daitom*, 741 F.2d at 1579.  Therefore, the contract between CSC and Iron Bow consists of the

---

9   Course of performance, course of dealing and usage of trade are now contained in Section 1-303.  *See* 13 PA. CONS. STAT. § 1303.

terms upon which they agreed, and the inconsistent cancellation terms at issue are knocked out. *See Tyco*, 2012 WL 4793745, at *4 (applying knockout rule to inconsistent cancellation provisions). In such scenario, CSC argues that the cancellation term should be replaced with the UCC's gap filler provision on anticipatory repudiation at 13 PA. CONS. STAT. § 2610[10] and, thus, Iron Bow breached the contract by unilaterally cancelling the Purchase Order. (*See* Docket Nos. 37 at 15; 44 at 13-14; 48 at 3-4). Iron Bow contends, however, that if the knockout rule is applied, the relevant gap filler provision is Section 2309(c)[11] relating to termination of the contract, which would permit it to terminate and cancel the Purchase Order. (*See* Docket Nos. 41 at 23; 46 at 17-18).

Iron Bow is incorrect that Section 2309, relating to termination with reasonable notice, is the appropriate gap filler. By its terms, that section applies to contracts which provide for "successive performances" but are "indefinite in duration." *See* 13 PA. CONS. STAT. § 2309(b). As one court construing this section explained:

> a contract requiring ongoing or successive performance with an indefinite duration "is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." *See* 13 Pa.C.S.A. § 2309(b). Termination, however, "requires reasonable notification." *See* 13 Pa.C.S.A. § 2309(c). "[A]pplication of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement." *See* 13 Pa.C.S.A. § 2309 comment 8.

*Triple Crown Am., Inc. v. Biosynth AG*, No. CIV. A. 96-7476, 1999 WL 305342, at *3 (E.D. Pa. May 14, 1999). Section 2309 is plainly inapplicable here because the parties' agreement was not

---

10   According to that provision, when a party repudiates a contract with respect to performance not yet due, the other party may "resort to any remedy for breach (section 2703 or 2711), even though he has notified the repudiating party that he would await performance by the latter and has urged retraction." 13 PA. CONS. STAT. § 2610(2).

11   That section provides, "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable." 13 PA. CONS. STAT. § 2309(c).

one for ongoing or successive performance with an indefinite duration. As shown by the Quote and Purchase Order, Iron Bow purchased specific Belden Products in specific quantities to be delivered in a certain timeframe.

In a situation similar to this case where the parties' cancellation terms conflicted, the court determined that UCC § 2-610 was the appropriate gap filler and found that the plaintiff was entitled to damages when the defendant unilaterally cancelled the contract.[12] *See Reaction Molding Techs,. Inc. v. General Elec. Co.*, 588 F. Supp. 1280, 1290 (E.D. Pa. 1984). Likewise, here, the Court agrees that § 2-610 is the appropriate gap filler. Iron Bow's email in June 2018 stating that it was cancelling the Purchase Order signified that it would not continue with performance, which constituted a repudiation of the parties' contract entitling CSC to resort to any remedy for breach provided in the UCC. *See* 13 PA. CONS. STAT. § 2610.

### C. Iron Bow Breached the Parties' Contract by Cancelling the Purchase Order, Resulting in Damages to CSC.

Pursuant to the above analysis, Iron Bow breached the parties' contract under the applicable UCC gap filler by cancelling the Purchase Order. In the alternative, the Court observes that such determination is consistent with the record evidence which shows that Iron Bow knew and understood that the Purchase Order could not be cancelled for the vast majority of the Belden

---

[12]   In *Tyco*, which also involved conflicting cancellation terms that were knocked out, the plaintiff argued that Section 2610 was the appropriate gap filler, whereas the defendant contended that the parties' course of dealing provided the missing term. *Tyco*, 2012 WL4793745, at *4 (citing 13 PA. CONS. STAT. § 2610 and observing that when a party repudiates a contract with respect to performance not yet due, the aggrieved party may treat the repudiation as a breach of contract). The *Tyco* court found that the parties' course of dealing may supply the missing term in that case because the defendant referenced in its answer and affirmative defenses a particular policy governing adjustments to its orders which may have permitted cancellation. *Id.* at *4-5. "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." 13 PA. CONS. STAT. § 1303(b). Courts have held that a single transaction cannot constitute a course of dealing. *See e.g., Kern Oil & Refining Co. v. Tenneco Oil Co.*, 792 F.2d 1380, 1385 (9th Cir. 1986); *Frix v. Integrity Med. Sys., Inc.*, No. 1:16-cv-02559, 2017 WL 4171987, at *7 (W.D. Tenn. Sept. 20, 2017). Unlike *Tyco*, course of dealing is not the appropriate gap filler here because the evidence suggests only one prior dealing between the parties. *See* Docket Nos. 42, ¶ 7; 45, ¶ 7) (indicating that CSC proposed utilizing a previously negotiated version of Iron Bow's terms and conditions for purposes of its purchase of the Belden Products).

Products.  The Quote clearly identified certain products as non-cancellable or non-returnable.  (Docket No. 39-3 at 2-9).  After the Quote issued, the parties agreed to the Negotiated Terms which were to have been included in the Purchase Order.  (Docket Nos. 38, ¶¶ 15, 16, 18; 47, ¶¶ 15, 16, 18).  Pursuant to the cancellation provision in the Negotiated Terms, if Iron Bow cancelled the Purchase Order, CSC could invoice Iron Bow for its costs and expenses incurred in connection with the order.  (Docket Nos. 38, ¶ 19; 47, ¶ 19).

The evidence shows that the parties intended the Negotiated Terms to apply to their sales contract, despite Iron Bow's failure to annotate the Purchase Order to include them after committing to do so.  Iron Bow acknowledges as much in its briefing, stating that "the parties understood and **intended** that [the Negotiated Terms] would apply" but they "were not actually incorporated into any contractual document between the parties."  (Docket No. 46 at 8, n.1; *see also* Docket No. 41 at 14, n.3 (indicating that "Iron Bow's Jason Peters noted that a reference to [the Negotiated Terms] would need to be appended to the Purchase Order" but "[n]o such unique reference was ultimately included.")).  Iron Bow makes no attempt to explain why this occurred.  Nonetheless, Iron Bow's acknowledgment that the parties intended the Negotiated Terms would apply shows it understood that it would be bound by the negotiated cancellation provision, which permitted CSC to invoice Iron Bow for its costs and expenses associated with the order in the event of cancellation.

Iron Bow's understanding about cancellation and its associated costs is further shown by Iron Bow's conduct after the Purchase Order issued, evidencing that Iron Bow knew CSC had purchased the Belden Products and was prepared to supply them to Iron Bow.  In late December 2017, Iron Bow directly requested that Belden "continue to produce equipment for [the] order," but "not ship any more items against this PO until further notice."  (Docket Nos. 38, ¶¶ 27, 28; 47,

¶¶ 27, 28).  Iron Bow subsequently asked CSC to do a "ship-in-place type deal," in which CSC would bill Iron Bow for the remaining Belden Products but continue to hold them.  (Docket Nos. 38, ¶ 31; 47, ¶ 31).  Iron Bow and CSC also exchanged emails regarding a potential "bill and hold" arrangement.  (Docket No. 39-15).  CSC informed Iron Bow in June 2018 that its parent, WESCO, "made a decision to have the Belden material to be shipped to a Wesco location."  (Docket Nos. 38, ¶ 38; 47, ¶ 38).  CSC also informed Iron Bow that it would hold the material in a WESCO facility but transfer ownership to Iron Bow as it would be customer owned, and no storage fee would apply until August 1, 2018.  (Docket No. 39-16 at 2).  The Belden Products ultimately were shipped to a WESCO facility and, as Iron Bow admits, CSC paid Belden in full for them.  (Docket Nos. 38, ¶¶ 42, 43; 47, ¶¶ 42, 43).  All of this shows that Iron Bow was well aware that CSC procured the Belden Products for Iron Bow and could have delivered them, but did not do so at Iron Bow's request.

The evidence likewise shows that Iron Bow was well aware that the Purchase Order could not be cancelled for many of the Belden Products.  In that regard, Iron Bow sent multiple letters to Centech reiterating that the vast majority of the Belden Products were "non-returnable and non-cancellable," demanding payment for same, and ultimately filing suit against Centech.  (Docket Nos. 39-22 at 3; 39-23 at 2; 39-24 at 2; 39-25).  All told, Iron Bow's actions make clear that it knew and understood that much of the Purchase Order was "non-cancellable" and, consistent with the Negotiated Terms, CSC could invoice Iron Bow for the costs it incurred in fulfilling the order for the Belden Products if Iron Bow cancelled the Purchase Order.[13]

---

13     The parties dispute whether Centech cancelled its order to Iron Bow (which was a condition precedent to cancellation under the Negotiated Terms), or whether Iron Bow was fired from the Project for poor performance.  (*See* Docket Nos. 37 at 11-12; 46 at 14).  The Court finds that this dispute is immaterial to resolution of summary judgment.  Putting aside the reason for Iron Bow's cancellation, CSC could invoice Iron Bow for its costs and expenses in the event of cancellation as explained herein.

In sum, the record establishes that CSC is entitled to summary judgment on its breach of contract claim. There is no dispute that the parties entered into a contract pursuant to which CSC was to supply the Belden Products to Iron Bow, much of which could not be cancelled. CSC procured the Belden Products and could have supplied them to Iron Bow, but for Iron Bow's request that they not be delivered. Iron Bow cancelled the Purchase Order in breach of the parties' contract, resulting in damages to CSC given that it has paid in full for the Belden Products and continues to store them without payment from Iron Bow.

## VI.   <u>CONCLUSION</u>

There is no genuine issue of material fact concerning Iron Bow's liability to CSC for breach of contract. Accordingly, Plaintiff's motion for summary judgment (Docket No. 36) will be granted and Defendant's motion for summary judgment (Docket No. 40) will be denied.

An appropriate Order follows.


<u>*W. Scott Hardy*</u>
W. Scott Hardy
United States District Judge

Date:   March 29, 2021


cc/ecf:  All counsel of record